UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BARBARA G. MARTIN,                 )
                                   )
          Plaintiff,               )
                                   )
     v.                            )   Case No. 4:10CV1507 JCH/FRB
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
          Defendant.               )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

          This cause is before the Court on plaintiff Barbara G.
Martin's appeal of an adverse ruling of the Social Security
Administration.   All pretrial matters were referred to the
undersigned United States Magistrate Judge for appropriate
disposition pursuant to 28 U.S.C. § 636(b).

### I.  Procedural History

          On January 11, 2006, plaintiff Barbara G. Martin
("plaintiff") filed an application for Disability Insurance
Benefits pursuant to Title II of the Social Security Act, 42 U.S.C.
§§ 401, et seq. (also "Act") alleging disability as of March 8,
2005 (Administrative Transcript ("Tr.") 42; 90-94).  Plaintiff's
claim was initially denied, (Tr. 56-62), and she requested a
hearing before an Administrative Law Judge (ALJ), which was held on
August 29, 2007.  (Tr. 42; 11-37).  During the hearing, plaintiff
testified and was represented by counsel.  (Tr. 11-37).  On
February 28, 2008, the ALJ issued a decision denying plaintiff's

-1-

claim.  (Tr. 6-23).  Plaintiff subsequently sought review from defendant agency's Appeals Council, and on July 14, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 3-6). In so doing, the Appeals Council noted that it had reviewed additional evidence, which it made part of the record.  (Tr. 6).[1] The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  Plaintiff's Testimony

During plaintiff's administrative hearing, she testified that she was 53 years of age, had completed the twelfth grade, and lived in a home with her husband, who was employed as an electrician.  (Tr. 16-17).  She testified that she has health insurance through her husband.  (Id.)  She last worked at Mineral Area Hospital as a data entry worker, a job she held for 18 months. (Tr. 17).  Plaintiff described these job duties as typing on the computer, making copies, and taking care of patients, and stated that sitting all day gave her the most pain.  (Tr. 19).  She testified that she quit this job because she "just couldn't do it anymore," and that she "just couldn't sit and do it and then I

_____

[1]This additional evidence consists of treatment records noted to be from Dr. Katherine Diemer dated March 25, 2008; treatment records from Advanced Pain Center dated April 10, 2008 through October 2, 2008; treatment records from Guy Roberts, D.O., dated July 30, 2008 through February 18, 2009; and a mental impairment questionnaire dated February 19, 2009 from Bun Tee Co, M.D., and Janet Murdick, APRN.  (Tr. 6).  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

would have to stand up and I would have to sit down and try and do it again." (Tr. 17-18). She testified that her back and her hand hurt, and that she had pain down her leg. (Tr. 19). Plaintiff testified that she quit a previous job at a Kroger supermarket, explaining that "my doctor said I couldn't do that job anymore because of my health. He said I needed to get another job with, you know, maybe doing computers and stuff." (Tr. 18).

Plaintiff testified that she was unable to work due to fragile bones, and explained that she had a fracture in her hand and ankle, and that all of her toes had been fractured. (Id.) She testified that she had surgery on her back, and had pain down her leg down to her foot and constant back pain for which she took pain medication. (Id.) Plaintiff denied receiving mental health treatment and denied suffering from any mental health problems, but did state that she suffered from depression due to her inability to work. (Id.) She testified that she could only sit for about 30 minutes, and could not sit on her left side. (Tr. 20). Plaintiff testified that she was unable to be on her feet, and could stand for only 10 or 15 minutes. (Tr. 21-22).

When asked whether her condition had worsened since leaving her hospital job, plaintiff replied, "[i]t's the same. It's gotten, well, it's progressively gotten a little worse, but it's, I still take the same medication. It's not, you know, it needs to be increased, I think." (Tr. 20). Plaintiff testified that she had not talked to her doctor about increasing her medication, and testified that the medication did help her pain.

(Id.) Plaintiff testified that the pain medication caused nausea, for which she took a nausea pill. (Tr. 21). She testified that she took medication for depression, which helped her. (Id.)

Plaintiff testified that she could not stand long enough to cook breakfast, and that her husband did the cooking, housework, and laundry, and brought her the laundry basket full of clothes, which she folded and he put away. (Tr. 22). She stated that she could walk on a flat surface, (Id.), and could lift and carry 10 to 15 pounds. (Tr. 23).

Plaintiff testified that her back pain began after she had surgery following an injury she sustained while working as a meat cutter. (Id.) She testified that she fell and broke her right kneecap in half. (Tr. 23-24). Plaintiff testified that, while she was working at Kroger, she had foot and toe pain, and had x-rays at Mineral Area Hospital which were negative. (Tr. 24). She stated that she subsequently saw a podiatrist who also performed x-rays, and told her that all of her toes were fractured, and that they were repeatedly fracturing. (Id.) She testified that she did not wear special footwear, and last had a toe fracture two weeks ago. (Tr. 25). Plaintiff stated that, when she sustained a toe fracture, she wrapped it with an ACE bandage. (Id.) She testified that she fractured her hand opening a door, and fractured her ankle walking. (Id.)

Plaintiff testified that she was most comfortable sitting on her side (the record does not specify which), and could maintain that position for 30 minutes before changing positions. (Tr. 25-

26).  She had no hobbies, did not leave her house, and did not receive any visitors because all of her friends worked.  (Tr. 26).  Plaintiff testified that she could not shop anymore, but that she could go to the grocery store to get "milk, eggs, bread, basic stuff, lunch meat," but leaned on the shopping cart.  (Id.)  She testified that she goes to Sunday School and church on Sundays, but did no outdoor activities and did not clean her house.  (Tr. 27).  When asked whether there was anything she could do other than fold laundry, she stated, "I put a roast in the oven once in a while."  (Id.)  She stated that she was able to bathe and dress herself and care for her personal needs, but had to sit down and then stand up while putting on her jeans.  (Tr. 27-28).

Plaintiff testified that she had not been referred to a specialist for her osteoporosis, but stated that she had seen a doctor who prescribed Evista[2] and stated that, if that did not help, she could participate in a clinical trial involving experimental injection therapy.  (Tr. 28).  Plaintiff testified that she planned to participate in the trial, but that she had not yet been approved for participation.  (Tr. 29).

Plaintiff stated that she was unable to play with her grandchildren, could not take care of her husband, and did not have friends because all of her friends worked.  (Tr. 30).  She testified that she used to be able to jump rope and play on the trampoline with her grandchildren, but could no longer do these

---

[2]Evista, or Raloxifine, is used to prevent and treat osteoporosis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698007.html

things. (Id.) She stated that she had not taken a vacation in years because she could not sit in a car for very long. (Id.) Plaintiff testified that she had trouble typing and using her hands, and stated that she did not use her home computer or write anything more extensive than a grocery list. (Tr. 30-31). She can use her hands to dress herself, but cannot stand and dry her hair. (Tr. 31). Plaintiff testified that she was able to get out of bed, shower and dress, and care for her personal needs every day, but that doing so took her a while. (Id.) She stated that she got out of bed between 2:00 and 3:00 every morning because she could not sleep due to back pain, and stated that she slept for four to five hours per night. (Id.)

Plaintiff testified that she was unable to bend, but denied problems reaching. (Tr. 32). She stated that she did not feel she could work as a cashier or at a booth where she would be allowed to sit or stand at will, because such a job would be uncomfortable for her, and likened such work to her former job at the hospital. (Tr. 32-33).

The ALJ then heard testimony from John E. Grenfell, a Vocational Expert (also "VE"). Dr. Grenfell characterized plaintiff's prior work as semi-skilled, and testified that her prior work as a meat clerk was classified as medium with a specific vocational factor (also "SVP") of three, and her data entry job as sedentary with an SVP of four. (Tr. 34). The ALJ asked Dr. Grenfell to assume an individual who was limited to less than occasional fingering, handling, grasping or turning, and asked

whether such an individual could perform plaintiff's past work. (Id.) Dr. Grenfell testified that such an individual could not perform plaintiff's past work, but could work in a job that did not require constant use of the hands, such as a surveillance system operator or an information clerk. (Tr. 34-35). Upon questioning from plaintiff's attorney, Dr. Grenfell testified that the Dictionary of Occupational Titles (also "DOT") specified the handling rate for these jobs as occasional, which, because it was the lowest rating, would be consistent with a finding that a person could perform less than occasional handling. (Tr. 35). Plaintiff's attorney then asked Dr. Grenfell to assume a person who, due to pain and depression, would be off-task for twenty percent of the workday, and Dr. Grenfell testified that such a person would be unable to sustain full-time work. (Id.) Following the hearing, the ALJ specified that the record was to be held open, and indicated that he intended to request some post-development of the record, add to the record plaintiff's most recent bone scan, and send plaintiff for a standard psychological evaluation with testing. (Tr. 36).

B.  Medical Records

The record indicates that plaintiff saw Stephanie Moniz, D.O., of Bonne Terre Primary Care (also "Bonne Terre Clinic") on July 9, 2003. (Tr. 256-57). It was noted that plaintiff was a smoker, and had various symptoms including pain in her back, legs and hips, sinus and respiratory problems, and gastrointestinal problems. (Id.) It was noted that plaintiff was taking

Hydrocodone,[3] Triazolam,[4] Premarin,[5] Paxil,[6] Protonix,[7] and Toprol.[8] (Tr. 257). These medications were refilled, and plaintiff was advised to have a mammogram. (Id.) On August 14, 2003, plaintiff underwent a mammogram, which evidenced a nodular density necessitating follow-up evaluation. (Tr. 255).

Plaintiff saw Dr. Moniz with complaints of breast soreness. (Tr. 252). An ultrasound performed on August 29, 2003 was negative. (Tr. 251). On September 22, 2003, plaintiff returned to the Bonne Terre Clinic and saw Jan Blue, R.N., with complaints of diarrhea, cough, sneezing, sinus drainage and chills. (Tr. 250). On November 10, 2003, plaintiff saw Ms. Blue for a general check-up, and requested laboratory work-up, which was performed. (Tr. 246-49). Plaintiff complained of chronic low back pain, a rash, and fatigue, and family stress. (Tr. 249). Ms. Blue diagnosed GERD, fatigue, depression, and chronic pain syndrome, and told plaintiff to stop smoking and return in six weeks. (Id.) On

---

[3]Hydrocodone is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

[4]Triazolam, also known as Halcion, is used on a temporary basis to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684004.html

[5]Premarin is used to treat symptoms associated with menopause. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682922.html

[6]Paxil, or Paroxetine, is used to treat depression, panic disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

[7]Protonix, or Pantoprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. It is also used to treat conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html

[8]Toprol, or Metoprolol, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682864.html

December 2, 2003, plaintiff saw Ms. Blue with complaints of back pain radiating down her left leg for the past week, and nausea, diarrhea, cramps and chills for the past three days. (Tr. 245). She stated that she was unable to sit due to pain. (Id.) Ms. Blue diagnosed low back pain with radiculopathy, ordered an MRI, and told plaintiff to remain off work for 6 days. (Id.)

An MRI performed on December 9, 2003 at Mineral Area Regional Medical Center revealed postoperative changes at L4-5 with a granulation reaction on the left at L4-5. (Tr. 242-43). All other levels of plaintiff's lumbar spine were reported to be normal, and it was specifically noted that there was no bulge or herniation. (Id.)

Plaintiff returned to the Bonne Terre Clinic and saw Dr. Moniz on January 26, 2004 with complaints of pain in her ears, neck and back. (Tr. 241). Dr. Moniz diagnosed ear wax impaction and increased back pain, irrigated plaintiff's ears, and increased her pain medication dosage. (Id.) Plaintiff returned to the Bonne Terre Clinic on March 16, 2004 with complaints of right knee pain, and it was noted that a prior workers' compensation knee case was not yet closed, and plaintiff was instructed to see her workers' compensation doctor. (Tr. 240). On April 21, 2004, plaintiff saw Dr. Moniz with complaints of left wrist pain, and to follow up regarding knee pain. (Tr. 239). Dr. Moniz diagnosed plaintiff with right knee pain. (Id.) An x-ray of plaintiff's right knee, performed on this same date at Mineral Area Regional Medical Center, was negative. (Tr. 260). A May 17, 2004 x-ray of

plaintiff's abdomen was negative.  (Tr. 235).

Plaintiff returned to the Bonne Terre Clinic on July 8, 2004 and reported to Ms. Blue complaints of fatigue, weight gain, abdominal cramping, bloating, frequent urination, dry mouth, and increased thirst.  (Tr. 228).  Plaintiff indicated that she slept eight hours per night, that her mood was ok, that she was raising her ten-year-old grandson (who had behavior problems), and that she was experiencing family stress.  (Id.)  Ms. Blue instructed plaintiff to add Effexor[9] and wean from Paxil, and referred plaintiff for pain management.  (Id.)

On July 21, 2004, plaintiff saw Kevin D. Rutz, M.D. for a spinal consultation.  (Tr. 264-65).  Plaintiff reported experiencing lower back pain and left leg pain since a work injury that occurred seven years prior.  (Tr. 264).  Plaintiff complained of back pain greater than her leg pain, and pain in her left buttock, posterior thigh, and calf.  (Id.)  She reported that she took Norco for pain and had undergone physical therapy, and stated that her pain was aggravated by bending, sitting, twisting, standing and increased activity, and improved with rest, medication and "after she gets warmed up a little bit."  (Id.)  She denied nausea, and other stomach/intestinal complaints.  (Id.)  Plaintiff stated that she felt her problems were getting worse.  (Tr. 264).  Under "Employment History," Dr. Rutz wrote that plaintiff "works at regular duty, doing computer work."  (Tr. 265).  Upon examination,

---

[9]Effexor, or Venlafaxine, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

Dr. Rutz noted that plaintiff's gait was smooth, and that she had full lumbar flexion and extension with back pain, but listed to the left side, and was tender to palpation in the mid line of the lumbar spine and left buttock. (Id.) Dr. Rutz noted that plaintiff had full strength in her lower extremities, and her hips and knees had full and painless range of motion and were stable. (Id.) Radiological imaging of plaintiff's lumbar spine showed a right-sided lower lumbar mild curvature, decreased disc space height at L4-5, and no signs of displaced vertebrae. (Id.) Dr. Rutz noted that an MRI performed on December 9, 2003 showed moderate degenerative changes of L4-5. (Tr. 265). Dr. Rutz diagnosed L4-5 degenerative disc disease, and left hip bursitis. (Id.) Dr. Rutz performed a brief series of steroid injections in plaintiff's back and hip. (Id.).

On August 25, 2004, plaintiff returned to the Bonne Terre Clinic and saw Ms. Blue with complaints of a productive cough, headache, sores in her nose, breathing problems, and pain in her upper back through her chest since August 15. (Tr. 221). A chest CT performed on August 26, 2004 at Mineral Area Regional Medical Center revealed hyperaeration changes with findings suggesting bronchitis. (Tr. 225, 262). Ms. Blue diagnosed plaintiff with bronchitis, rhinitis, asthma, and mood disorder. (Id.)

Plaintiff returned to Dr. Rutz on August 31, 2004, stating that none of the injections had helped her, and complained of continued left lower back and leg pain. (Tr. 263). Dr. Rutz noted that he reviewed with plaintiff her options, which included

that she could either "live with what she has" or could undergo surgery. (Id.) Dr. Rutz wrote that he explained to plaintiff that, if she chose surgery, a discogram would be required, and she would need to stop smoking. (Id.) Dr. Rutz noted that he told plaintiff that she was to call his office if she was interested in having surgery. (Id.)

Plaintiff returned to Dr. Moniz on September 17, 2004 for follow-up of her back and knee problems, reporting that she had seen Dr. Rutz, who had performed a steroid injection and advised plaintiff that she needed fusion surgery. (Tr. 220). Plaintiff returned to the Bonne Terre Clinic and saw Ms. Blue on September 28, 2004 with complaints of hot flashes, sweating, mood changes, and fatigue. (Tr. 218-19). Upon examination, plaintiff had full range of motion of all extremities, no spinal segmental dysfunction, and no spinal muscular spasms at any extremities. (Tr. 218). Ms. Blue diagnosed plaintiff with L4-5 degenerative disc disorder, fatigue, and mood disorder, and ordered testing. (Id.)

An x-ray of plaintiff's left great toe, performed on October 22, 2004 at Mineral Area Regional Medical Center, was negative. (Tr. 217). Bone density testing performed on October 26, 2004 at Mineral Area Regional Medical Center revealed that plaintiff had a T-score of -2.3, and that T-scores below -2.5 indicated significantly reduced bone density, or osteoporosis, "when compared to young normal persons of the same sex." (Tr. 211-13).

Plaintiff saw Ms. Blue on November 8, 2004 with complaints of a cyst on her leg with a painful lump in her left lower groin area. (Tr. 208). She denied experiencing nausea, vomiting or diarrhea. (Id.) Ms. Blue diagnosed plaintiff with a lymph node infection, prescribed Levaquin,[10] Mobic,[11] and cool compresses, and referred plaintiff to Dr. Wesley Harris for surgery. (Id.)

On November 22, 2004, plaintiff underwent a right upper quadrant ultrasound, which revealed a slightly prominent common bile duct, but was otherwise normal. (Tr. 207). She returned to the Bonne Terre Clinic the following day, and was diagnosed with abdominal pain. (Tr. 206).

On December 10, 2004, plaintiff underwent an obstructive series at Mineral Area Regional Medical Center, which revealed a clear chest, mild fecal retention, and scoliosis to the right at approximately L3-4. (Tr. 202).

On December 13, 2004, plaintiff saw Ms. Blue with complaints of a headache, GERD, generalized abdominal pain, and bowel symptoms. (Tr. 203). Upon examination, plaintiff had full range of motion of all of her extremities, with no muscle spasms or swelling. (Id.) Plaintiff was alert and oriented, and cooperative, with a bright affect. (Id.) She was diagnosed with

---

[10]Levaquin, or Levofloxacin, is used to treat infections such as pneumonia, chronic bronchitis and sinusitis, and infections of the urinary tract, kidney, and skin.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697040.html

[11]Mobic, or Meloxicam, is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601242.html

nausea with abdominal pain; GERD, headache, and constipation. (Id.) Plaintiff was given Zofran,[12] and lab work was ordered. (Id.)

On December 16, 2004, a head CT scan was normal. (Tr. 197). An abdominal/pelvic CT performed this same date revealed a dilated small bowel (suggesting either a severe obstruction or adhesions with partial obstruction), deformity of the bladder from the bowel changes, and deformity of the sigmoid colon. (Tr. 196). On April 6, 2005, plaintiff returned to Dr. Moniz with complaints of watery, thick-matted eyes, and a rash. (Tr. 191). Dr. Moniz noted that plaintiff had quit her job, and was seeking disability. (Id.) Plaintiff was diagnosed with abdominal pain, ringworm, and conjunctivitis. (Id.)

On April 12, 2005, diagnostic endoscopic testing of plaintiff's upper gastrointestinal tract performed at Mineral Area Regional Medical Center revealed a hiatal hernia and mild gastritis. (Tr. 186).

On May 25, 2005, plaintiff returned to Dr. Moniz with complaints of a cough, drainage, and sores on her nose. (Tr. 185). She was diagnosed with bronchitis. (Id.) She returned on July 27, 2005 with complaints of breast soreness. (Tr. 184). A breast ultrasound revealed small cystic areas bilaterally. (Tr. 183). Plaintiff was diagnosed with breast pain and advised to reduce her caffeine intake. (Tr. 184).

---

[12]Zofran, or Ondansetron, is used to relieve nausea and vomiting. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601209.html

On August 17, 2005, Nancy Muser, Senior DDS Counselor, noted that plaintiff failed to provide necessary functional and work history information that was needed for documentation. (Tr. 174).

Plaintiff returned to the Bonne Terre Clinic on August 25, 2005 and saw Ms. Blue for follow-up of bilateral breast soreness, and it was opined that her breast pain was linked to an increase in her Premarin dosage, which was reduced. (Tr. 181-82). Upon examination, she had full range of motion of her extremities, with no swelling. (Tr. 181). She was alert and oriented, had a bright affect, and was cooperative. (Id.)

Plaintiff returned to Dr. Moniz on November 9, 2005 for medication refill. (Tr. 179). It was noted that her musculoskeletal pain was tolerable. (Id.)

On April 11, 2006, Psychiatric Consultant J. Singer completed a Psychiatric Review Technique form, indicating that there existed insufficient evidence of any determinable impairment, noting that plaintiff's medical records showed her to have a bright affect, and to be cooperative, alert, and oriented. (Tr. 270-82). It is also indicated that plaintiff and her attorney were requested to provide functional information, which was not done, resulting in plaintiff's claim being denied due to her failure to cooperate. (Tr. 282).

On April 12, 2006, Consultant B. Huffman completed a case analysis, indicating that plaintiff's medical records did not indicate significant impairment and that plaintiff had failed to

provide functional information when requested to do so, and concluded that there was insufficient evidence to fully evaluate plaintiff's alleged condition. (Tr. 284).

On April 19, 2006, plaintiff saw Dr. Moniz with complaints of back pain radiating in to her leg to her knee, and stated she wanted to quit smoking. (Tr. 331). Dr. Moniz diagnosed sciatica and hypertension, and prescribed Depo-Medrol[13] and Flexeril.[14] (Id.)

On May 3, 2006, plaintiff saw Dr. Moniz with complaints of tingling and twitching in her left upper extremity, and chest pain. (Tr. 330). It was noted that her back pain had not improved. (Id.) Plaintiff returned on June 12, 2006 with complaints of pain in her left hip, and an x-ray was ordered. (Tr. 329).

On May 8, 2006, plaintiff underwent a mammogram at Mineral Area Regional Medical Center, which revealed normal findings. (Tr. 310). A cardiac stress test, performed on this same date, was also negative. (Tr. 311).

An x-ray of plaintiff's lumbar spine, performed on June 14, 2006 at Mineral Area Regional Medical Center, revealed mild scoliosis, but was otherwise negative. (Tr. 306). An x-ray of plaintiff's left hip, performed on this same date, was negative.

---

[13]Depo-Medrol, or Methylprednisolone, is a corticosteroid used to treat inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html

[14]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

(Tr. 307).

On July 2, 2006, plaintiff saw Dr. Moniz with complaints of nausea and a sensation that something was stuck in her throat. (Tr. 328). She was diagnosed with abdominal pain and dysphagia (difficulty swallowing). (Id.) Due to her complaints of difficulty swallowing, plaintiff underwent an oropharyngeal motility study at Mineral Area Regional Medical Center on August 14, 2006, which was interpreted as normal. (Tr. 293).

Records from Mineral Area Regional Medical Center indicate that plaintiff underwent a course of physical therapy from July 25, 2006 through August 10, 2006. (Tr. 294, 296, 312, 313-14). The discharge summary indicates that physical therapy was discontinued because plaintiff declined to continue care. (Tr. 294). Under "Current Physical Function Status," it is indicated that plaintiff was "independent with all activities." (Id.) It is indicated that most of plaintiff's short-term goals were met, but that her goal achievement could not be reassessed because plaintiff did not return for scheduled appointments. (Id.) Plaintiff was discharged with instructions for a home program. (Id.)

On August 18, 2006, plaintiff returned to Dr. Moniz with complaints of spots on her face and ear. (Tr. 327). She was referred to Dr. R. Young in Festus, Missouri for a plastic surgery consultation. (Id.)

On October 18, 2006, plaintiff saw Dr. Moniz with complaints of fatigue and sleeping all of the time, and complaints related to a left eye infection, including redness, matting,

drainage, and blurring.  (Tr. 337).  Dr. Moniz's impression was fatigue, and it is indicated that she advised smoking cessation and prescribed Chantix.  (<u>Id.</u>)

On December 15, 2006, plaintiff saw Dr. Moniz for follow-up and suture removal after Dr. Young removed two spots from her face.  (Tr. 336).

On January 8, 2007, plaintiff saw Dr. Moniz with complaints of left ear pain and cough, and pain in the areas from which spots were removed from her face.  (Tr. 335).  She was diagnosed with pharyngitis and prescribed Keflex.[15]  (<u>Id.</u>)

Plaintiff saw Dr. Moniz on April 2, 2007 with complaints of a sinus infection for the past four days, and complained of a headache, scratchy throat, productive cough, congestion, and poor sleep.  (Tr. 334).  It was noted she had increased back pain. (<u>Id.</u>)  She was diagnosed with sinusitis and bronchitis, and prescribed medication.  (<u>Id.</u>)

On July 13, 2007, plaintiff saw Dr. Moniz with complaints of left foot pain, and neck pain.  (Tr. 359).  Dr. Moniz's impression was osteoporosis and foot pain, and she ordered bone density screening.  (<u>Id.</u>)

A CT Bone Densitometry performed on July 18, 2007 at Mineral Area Regional Medical Center revealed bone mineral density values consistent with early osteoporosis.  (Tr. 352).  X-rays of plaintiff's left foot taken on that same date revealed previous

---

[15]Keflex is an antibiotic used to treat bacterial infections. <u>http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682733.html</u>

surgical changes, but was otherwise negative. (Tr. 354).

On August 1, 2007, plaintiff saw Dr. Moniz with complaints of infection in her nose and eye. (Tr. 358). She was diagnosed with conjunctivitis. (Id.)

On October 2, 2007, plaintiff underwent a consultative psychological examination with clinical psychologist Lauretta V. Walker, Ph.D., as ordered by the Disability Determination Services. (Tr. 341-50). Dr. Walker noted that she did not observe any motor problems during the session, and also noted that plaintiff was cooperative and pleasant, spent her time in the waiting room reading, and exhibited no unusual behaviors. (Tr. 342). Plaintiff reported that she had always worked, with the exception of when her daughter was born. (Tr. 341-42). She stated that she injured her back while working in the meat department at a Kroger grocery store. (Tr. 342). She stated that her doctor told her she should quit that job but she did not want to because she considered it to be a good job with good benefits, but eventually she quit. (Id.) She stated that she tried to work in data entry, but quit on March 15, 2005 due to back pain, and had not worked since. (Id.)

Plaintiff stated that she suffered three to four anxiety attacks per year for which she took Xanax,[16] and also stated that she took Hydrocodone for back pain, Protonics[17] for stomach

---

[16]Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[17]Protonix, or Pantoprazole, is used to treat gastroesophageal reflux disease, also known as GERD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html

problems, Halcion for sleep, Premarin, and Evista.  (Id.)

Plaintiff described an average day as rising at 3:00 a.m. to have coffee with her husband before he left for work, and then returning to bed until about 7:00 a.m.  (Tr. 342).  She stated that she did not eat breakfast or lunch, and that her husband prepared dinner and did all of the housework, but that she paid all of the bills and took care of finances.  (Tr. 342, 344).  She stated that their friends were mostly her family who lived nearby, and that she did a lot of reading and watched television.  (Tr. 342-43).  She stated that the weekends were the same, with the addition of church.  (Tr. 343).

Dr. Walker administered the Minnesota Multiphasic Personality Inventory (also "MMPI"), and that plaintiff's profile was associated with a somatoform, anxiety or depressive disorder, indicating sleep disturbance, despondency and hopeless feelings, and also indications of low energy and some signs of clinical depression.  (Id.)  Dr. Walker noted that plaintiff was alert and oriented in all areas, and that plaintiff had a normal appearance, affect, and mood, and had good eye contact.  (Id.)  Dr. Walker noted that plaintiff reported problems with sleep due to back pain; that she was up and down through the night; and that her husband had moved to another bedroom.  (Id.)  Dr. Walker wrote that plaintiff went "to bed about nine and gets up about seven in the morning," took naps through the day, and that dinner was her only meal of the day.  (Tr. 343).  Dr. Walker noted that plaintiff talked many times about her strong work ethic, and was resentful of

people who tried to take advantage of the system.  (Tr. 343-44).

Dr. Walker wrote that plaintiff "seems to be very disturbed by her inability to work any longer.  However, she does not mention her discomfort and pain very often.  The MMPI-2 presents the possibility that she has a somatoform type of disorder which means that she is not intentionally producing or feigning symptoms but has symptoms that are not backed up by physical/medical data."  (Tr. 344).  Dr. Walker noted that plaintiff was apparently a well-organized person who kept things in place, and that being unable to do so was a blow to her self-concept.  (Id.)  Dr. Walker noted that plaintiff's anxiety attacks were "rather atypical and quite infrequent," and that there were some indications of depression and anxiety which were probably associated with plaintiff's situation.  (Id.)

Dr. Walker opined that plaintiff had moderate limitations in her ability to respond appropriately to work pressures and changes in a work setting, and mild limitations in all other areas.  (Tr. 349).

On March 25, 2008, plaintiff was seen at the Division of Bone and Mineral Diseases - The Bone Health Program at Washington University School of Medicine.  (Tr. 369).  Plaintiff reported that she had sustained multiple fractures in her hands and feet, and explained that she fractured her feet after standing all day on a hard surface, and fractured her hand when she opened a door.  (Id.) She denied seeking medical attention.  (Id.)  She complained of pain while walking.  (Id.)  Plaintiff was diagnosed with osteopenia

and advised to increase her calcium intake and stop smoking, and to follow-up in one year. (Tr. 369).

The record indicates that plaintiff was treated at the Advanced Pain Center from April 10, 2008 through October 2, 2008. (Tr. 373-421). On April 10, 2008, Najmeddin Beyranvand, M.D., noted that plaintiff walked with a mild limp, and that she had midline tenderness in her lumbar spine, and mild tenderness on the left, and pain with 75 degree flexion and 25 degree extension. (Tr. 420). Plaintiff had no pain in her ankles or feet. (Id.) He recommended an MRI. (Tr. 421).

Dr. Beyranvand noted similar findings when he examined plaintiff again on April 25, 2008, and noted that plaintiff was able to walk on her heels and toes, and that she had normal muscle tone and sensation in her upper and lower extremities. (Tr. 413). He noted that plaintiff's MRI showed degenerative disc disease and "mild disc bulges and spinal stenosis." (Tr. 411). On April 28, 2008 and May 12, 2008, Dr. Beyranvand performed Lumbar Medial Branch Block injections. (Tr. 407-10; 403-06). On May 27, 2008, Dr. Beyranvand performed a Radiofrequency of Lumbar Medial Branch, or "RFA." (Tr. 398-402). Plaintiff returned on June 25, 2008, and reported no relief following the RFA, and stated that she had pain in the left sacroiliac area and in her lateral hip and thigh; could not stand for any period of time; and that 15 minutes of standing was all she could tolerate. (Tr. 394). With regard to plaintiff's lumbar spine, Dr. Beyranvand noted midline tenderness and off the midline only on the left, and that plaintiff had flexion to 75

-22-

degrees and extension to 25 degrees with pain, which was noted to be "moderate" with flexion and "mild" with extension. (Tr. 396). Her mood and affect were normal. (Id.) Dr. Beyranvand diagnosed lumbosacral spondylosis without myelopathy. (Id.)

On July 16, 2008, plaintiff saw Dr. Beyranvand and reported that her last injection had not helped. (Tr. 390). Dr. Beyranvand performed a sacroiliac joint injection. (Tr. 392-93). On July 30, 2008, plaintiff reported that the injection had helped, and Dr. Beyranvand performed another injection. (Tr. 388). Plaintiff underwent additional injections in September and October of 2008, (Tr. 374-81). On October 2, 2008, plaintiff reported that she had a right foot stress fracture. (Tr. 376). It is noted that plaintiff's medication were "helping partially," and that there were no side effects. (Id.) Dr. Beyranvand advised plaintiff to avoid cigarettes and continue with her current medication, with no lifting above 20 pounds; no squatting, kneeling or climbing and certain twisting. (Id.) He diagnosed plaintiff with "chronic [low back pain]/failed low back surgery syndrome/lumbar sprain/strain/left hip trochanteric bursitis/left sensor lumbar radiculopathy." (Id.)

The record indicates that plaintiff received treatment from Guy Roberts, D.O., at Midwest Health Group, LLC from July 30, 2008 to February 18, 2009. (Tr. 423-44). On July 30, 2008, plaintiff reported chronic low back pain that radiated to the left posterior thigh. (Tr. 441). Upon examination, Dr. Roberts noted that plaintiff was well-developed and nourished, and in no apparent

distress. (Tr. 442). Musculoskeletal examination revealed normal range of motion, strength and tone, and neurological examination revealed normal motor and sensory function, reflexes, gait and coordination. (Id.) Dr. Roberts recommended massage, home back strengthening exercises, weight loss, and smoking cessation, and advised plaintiff to return in five months. (Tr. 443).

Plaintiff returned to Dr. Roberts on September 22, 2008 for evaluation for a panic attack. (Tr. 438). Dr. Roberts wrote as follows:

> Her symptom complex includes chest pain, dry mouth, light-headedness, and palpitations. True panic attacks occur in addition to generalized anxiety. The frequency symptoms [sic] is several times per month. There are no apparent triggers that increase the anxiety. Current treatment includes a scheduled (rather than [as needed]) benzodiazepine and Celexa. She has had no prior treatment for anxiety.
>
> (Id.)

Upon review of plaintiff's musculoskeletal symptoms, Dr. Roberts wrote that it was "[n]egative for arthralgias, back pain, and myalgias." (Id.) Upon examination, Dr. Roberts noted that plaintiff had normal range of motion, strength and tone, and that her nerves, motor and sensory function, reflexes, gait and coordination were all intact. (Tr. 439). He diagnosed plaintiff as having had a panic attack, and refilled her medications. (Tr. 439-40).

Plaintiff returned to Dr. Roberts on October 22, 2008 with complaints of urinary urgency. (Tr. 434). She had no other

complaints.  (Id.)  Dr. Roberts noted that plaintiff seemed to be in mild pain, and that she was tender in her right lower quarter. (Tr. 435).  He prescribed Bactrim[18] and Pyridium.[19]  (Id.)  Plaintiff returned on October 29, 2008 with complaints of constipation and urinary incontinence.  (Tr. 431).  She had no other complaints, and Dr. Roberts specifically noted that she had no complaints of back pain.  (Id.)  Dr. Roberts diagnosed left lower quadrant abdominal pain and constipation, and prescribed Amitza.[20]  (Tr. 432).  On February 18, 2009, plaintiff saw Dr. Roberts with complaints of urinary urgency, and Dr. Roberts again noted the absence of other complaints, including back pain.  (Tr. 424).  Upon examination, plaintiff had normal range of motion, strength and tone.  (Tr. 425).

The record includes a "Psychiatric/Psychological Impairment Questionnaire" from Bun Tee Co, M.D., and Janet Murdick, APRN, dated February 19, 2009.  (Tr. 445-54).  The form indicates that plaintiff had been seen on a monthly basis beginning April 23, 2008 through January 14, 2009.  (Tr. 447).  The form indicates a

---

[18]Bactrim, or Co-trimoxazole, is a combination of trimethoprim and sulfamethoxazole, a sulfa drug. It eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684026.html

[19]Pyridium, or Phenazopyridine, relieves urinary tract pain, burning, irritation, and discomfort, as well as urgent and frequent urination caused by urinary tract infections, surgery, injury, or examination procedures.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682231.html

[20]Amitza, or Lubiprostone, is used to relieve stomach pain, bloating, and straining and produce softer and more frequent bowel movements in people who have chronic idiopathic constipation (difficult or infrequent passage of stools that lasts for 3 months or longer and is not caused by a disease or a medication).  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607034.html

diagnosis of Panic Disorder without Agoraphobia (fear of public places), and recurrent Major Depression. (Id.) Chronic pain is indicated in Axis III (General Medical Conditions), and "Marital - Relationships" is indicated for Axis IV (Psychosocial and Environmental Problems). (Id.) It was indicated that plaintiff's current Global Assessment of Functioning (also "GAF") score was 48, and that her highest GAF in the preceding year was 56. (Id.) Her prognosis was listed as "Guarded." (Id.) Clinical findings were indicated via check mark, and included poor memory, appetite disturbance with weight change, sleep and mood disturbance, emotional lability, social withdrawal, blunt flat or inappropriate affect, decreased energy, recurrent panic attacks, loss of interest, generalized anxiety, difficulty thinking or concentrating, and hostility and irritability. (Tr. 448). For plaintiff's "primary symptoms," it is written "[d]epressed, no energy, anxious, constant worrying, loss of appetite." (Tr. 449). It is opined that plaintiff had not required hospitalization or emergency room treatment for her symptoms. (Id.) It was opined that plaintiff was markedly limited in her ability to understand remember and carry out detailed instructions; maintain attention and concentration for extended periods; maintain a schedule and be punctual; work in coordination with or proximity to others without being distracted; complete a normal workweek; get along with co-workers/peers; and respond to work setting changes. (Tr. 450-51). It was opined that plaintiff was moderately or mildly limited in all other areas. (Id.) There were no areas in which plaintiff was

found to have no limitation. (Tr. 452). It was opined via check mark that plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw and/or experience exacerbation of signs or symptoms, and it was explained that plaintiff suffered exacerbation of symptoms when out in public. (Id.) It was indicated that plaintiff was taking Clonazepam,[21] Seroquel[22] and Celexa,[23] and no side effects were listed. (Id.) It is indicated that plaintiff's psychiatric condition exacerbates her pain and physical symptoms, which included chronic pain in her back, neck and legs. (Tr. 453).

The form solicited information regarding the degree of work stress plaintiff could tolerate, and it is indicated that plaintiff was capable of low stress. (Id.) It is opined that she would miss work more than three times per month due to her symptoms. (Tr. 454). It is indicated that the earliest date that the description of symptoms and limitations expressed in the Questionnaire could apply to was plaintiff's first visit on April 23, 2008.[24] (Id.)

### III.    The ALJ's Decision

The ALJ in this case determined that plaintiff met the

---

[21]Clonazepam, also known as Klonopin, is used to control anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

[22]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

[23]Celexa, or Citalopram, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html

[24]The ALJ in this case issued his decision on February 28, 2008.

-27-

insured status requirements through June 30, 2010, and had not engaged in substantial gainful activity since March 8, 2005, her alleged onset date. (Tr. 44). He determined that plaintiff had the severe impairments of moderate lumbar degenerative arthritis, early osteoporosis and mild scoliosis, but did not have an impairment or combination of impairments of listing-level severity. (Tr. 44-45). The ALJ determined that plaintiff retained the residual functional capacity to "occasionally stand and walk for 2 of 8 work hours, sit for 6 of 8 work hours and lift and carry up to 10 pounds," and wrote that the evidence was "very clear that [plaintiff] can engage in a full range of sedentary work." (Tr. 49). The ALJ determined that plaintiff was capable of performing her past relevant work as a data entry clerk. (Id.) The ALJ noted that the VE testified that, with plaintiff's residual functional capacity for sedentary work, she could perform her past relevant work as a data clerk. (Id.) The ALJ noted that, in response to questioning from plaintiff's counsel, the VE testified that plaintiff would be unable to work. (Id.) The ALJ wrote that he did not find that the work-related limitations plaintiff's attorney described during such questioning were supported by the evidence, or credible. (Tr. 49). The ALJ concluded that plaintiff had not been under a disability as defined in the Act from March 8, 2005 through the date of the decision. (Tr. 49-50).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security

Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140–42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If

claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and
      consulting physicians.

4.    The plaintiff's subjective complaints
      relating to exertional and non-exertional
      activities and impairments.

5.    Any corroboration by third parties of the
      plaintiff's impairments.

6.    The testimony of vocational experts when
      required which is based upon a proper
      hypothetical question which sets forth
      the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86

(8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85

(8th Cir. 1989)).

    The Court must also consider any evidence which fairly

detracts from the Commissioner's decision.  Coleman, 498 F.3d at

770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

However, even though two inconsistent conclusions may be drawn from

the evidence, the Commissioner's findings may still be supported by

substantial evidence on the record as a whole.  Pearsall, 274 F.3d

at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.

2000)).  "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the

record could also have supported an opposite decision." Weikert v.

Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

marks and citation omitted); see also Jones ex rel. Morris v.

Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

    In the case at bar, plaintiff alleges several points of

error arising from the ALJ's credibility and RFC determinations. Regarding the ALJ's RFC determination, plaintiff contends that the ALJ erroneously expressed the RFC determination in terms of the exertional category of sedentary work, failing to make specific findings regarding plaintiff's ability to lift, carry, push, pull, sit, stand, walk, "or any other exertional requirement." (Docket No. 19 at page 16). Plaintiff also argues that the ALJ erroneously failed to include sufficient limitations arising from her mental impairment. Plaintiff further contends that the ALJ failed to properly analyze evidence of her physical impairments, ignoring evidence favorable to her claim. Regarding the ALJ's credibility determination, plaintiff contends that the ALJ substituted his own judgment for that of a medical professional when he discredited plaintiff's subjective complaints of pain after noting the absence of any evidence of reduced joint motion, muscle spasm, sensory deficit and motor disruption. Plaintiff also alleges that the ALJ failed to conduct a proper credibility analysis inasmuch as he failed to consider her medication side effect of nausea. Finally, plaintiff argues that the Commissioner erroneously failed to consider new and material evidence that was presented to the Appeals Council and that supports a RFC of significantly less than sedentary work. In response, the Commissioner contends that substantial evidence supports the ALJ's decision. Having reviewed the evidence of record, and considered the ALJ's decision and the arguments of both parties, the undersigned concludes that the decision should be affirmed.

A.  Credibility Determination

In the case at bar, after citing 20 C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-7p and listing all of the factors relevant to credibility determination, the ALJ evaluated the evidence of record and discredited plaintiff's allegations of symptoms precluding all work.  Plaintiff challenges this determination, arguing that the ALJ failed to follow the applicable rules and cases in considering her credibility inasmuch as he failed to consider that she suffered nausea as a medication side effect.  Plaintiff also contends that the ALJ substituted his own judgment for that of a medical professional when he discredited her subjective complaints of pain after noting the absence of any evidence of reduced joint motion, muscle spasm, sensory deficit and motor disruption.  Having reviewed the ALJ's decision, the record as a whole, and considered the arguments of the parties, the undersigned determines that the ALJ properly considered all of the evidence of record, and that substantial evidence supports his adverse credibility determination.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217).  Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged impairments.  Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Because of the subjective nature of physical symptoms, and the

absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.
>
> Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The ALJ is not required to discuss each Polaski factor

as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (while the Polaski factors should be taken into account, "we have not required the ALJ's decision to include a discussion of how every Polaski 'factor' relates to the claimant's credibility.") "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

As noted above, the ALJ in this case cited 20 C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-7p, which correspond with Polaski and credibility determination. (Tr. 46). The ALJ also listed the relevant factors as noted by the Eighth Circuit in Polaski, including the duty to consider whether plaintiff suffered from medication side effects. (Tr. 46). Finally, the ALJ specifically noted in his decision that plaintiff complained of nausea. (Tr. 47). As noted above, the ALJ was not required to include in his decision a discussion of how each and every Polaski factor related to plaintiff's credibility. See

Samons, 497 F.3d at 820 (citing Tucker, 363 F.3d at 783); see also Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted) (an ALJ "need not explicitly discuss each Polaski factor," and "[i]t is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints.") Here, the ALJ cited the Polaski factors, including the acknowledgment of his duty to evaluate medication side effects, and noted plaintiff's complaints of nausea. Also detrimental to plaintiff's argument that the ALJ failed to properly consider nausea is the fact that the record documents that plaintiff often denied experiencing nausea, (Tr. 208, 264, 374, 414), and, when she was seen at the Advanced Pain Center on October 2, 2008, she reported that her medication helped her partially and caused no side effects. (Tr. 374). The undersigned therefore cannot conclude, as plaintiff suggests, that the ALJ failed to give proper attention to nausea as a medication side effect. Having reviewed the record and the arguments of the parties, the undersigned determines that there was no error in the ALJ's treatment of evidence that plaintiff suffered from nausea as a side effect of medication.

In reaching his adverse credibility determination, the ALJ conducted an exhaustive analysis of the evidence of record. The ALJ acknowledged plaintiff's bone density testing that revealed changes consistent with early osteoporosis, and concluded that such results did not support her allegations of a completely debilitating bone condition. The ALJ noted that, while plaintiff

testified that she quit working in March of 2005 due to back pain, the record documents little evidence of treatment for back complaints at that time. The absence of ongoing medical treatment is inconsistent with subjective complaints of pain. Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (functional limitations are inconsistent with failure to obtain regular medical treatment); see also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions). The ALJ also noted the fact that Dr. Rutz gave plaintiff the option of having surgery if she quit smoking, and instructed her to contact his office if interested in surgery, but that there was no indication that she ever returned. While certainly not dispositive, the undersigned notes that plaintiff's rejection of a treatment option that could potentially alleviate her symptoms is inconsistent with her complaints of debilitating back pain. See Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) (upholding the ALJ's adverse credibility determination in which the ALJ had noted, inter alia, that the claimant rejected her physicians' recommendations to have surgery to reduce her pain). Also non-dispositive but relevant is the fact that plaintiff refused to stop smoking despite repeated medical advice to do so, and despite being told that smoking cessation would enable her to have back surgery. A claimant's willingness to submit to treatment is relevant in analyzing her allegations of disabling symptoms.

See Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999). Complaints of pain may be discredited where a claimant ceases to stop smoking upon a doctor's advice. See Wheeler v. Apfel, 224, F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding that impairments which are controllable or amendable to treatment including certain respiratory problems, do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application for benefits); see also Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (an ALJ may properly consider the claimant's failure to take prescription medications, seek treatment, and quit smoking).

The record also indicates that plaintiff's physical therapy was discontinued and that her progress towards her goal could not be evaluated because plaintiff refused to keep her scheduled physical therapy appointments. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (it was proper to consider the fact that the claimant cancelled several physical therapy appointments). The record also reflects that, on several occasions, plaintiff did not complain of back pain while receiving other treatment. Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

In addition, as discussed above, the ALJ noted several instances in the record of objective medical findings that

consistently yielded little in the way of objective medical findings to support plaintiff's allegations of debilitating pain. The ALJ noted that the objective medical evidence was not particularly abnormal. The ALJ noted that radiological findings demonstrated only moderate degenerative changes, early osteoporosis, mild lumbar curvature, and a normal hip and pelvis. The ALJ noted that plaintiff did not have motor, sensory or reflex abnormalities, and had full range of motion without muscle spasm, and that the psychologist who spent two hours with plaintiff noted that she exhibited no unusual behaviors or motor problems. A lack of objective medical findings is relevant to credibility determination. Mouser, 545 F.3d at 638; see also Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (the lack of objective medical evidence is one factor ALJ may consider in assessing a claimant's credibility).

The ALJ also noted that, despite being asked to provide information to document her claims of disability, plaintiff failed to cooperate, and that this did not enhance her credibility. The fact that a claimant is less than candid in supplying information is a factor which discounts the claimant's credibility with respect to subjective complaints. Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).

The ALJ also observed that there were no current reports from any acceptable medical sources opining that plaintiff should not work. The ALJ also noted that, while the plaintiff alleged an onset date of March 8, 2005, there were no medical records

-39-

indicating that any treating physician recommended that plaintiff cease working at that time. As the ALJ wrote, a record which contains no physician opinion that the claimant is unable to work detracts from subjective complaints of total disability. Raney v. Barnhart, 396 F.3d 1007, 1010-11 (8th Cir. 2005); see also Edwards v. Secretary of Health and Human Service, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons, 647 F.2d at 863.

Plaintiff contends that the ALJ erroneously substituted his own judgment for that of a medical professional when he discredited her subjective complaints after noting the absence of any evidence of reduced joint motion, muscle spasm, sensory deficit, and motor disruption. Plaintiff's argument is unavailing. In his decision, the ALJ cited 20 C.F.R. § 404.1529(c)(2) and wrote: "[r]educed joint motion, muscle spasm, sensory deficit, and motor disruption are useful indicators to assist in making reasonable conclusions about the intensity and persistence of symptoms and the effect those symptoms, such as pain, may have on the ability to work." (Tr. 48). Indeed, section 404.1529 provides that the ALJ will consider the extent to which symptoms are consistent with medical signs and laboratory findings. Medical signs are anatomical, physiological, or psychological abnormalities that can be observed apart from a claimant's subjective complaints. 20 C.F.R. § 404.1528(b). Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown through the use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 404.1528(c). Therefore, contrary to

plaintiff's argument, the ALJ was following the Regulations when he noted the absence of any evidence of reduced joint motion, muscle spasm, sensory deficit, and motor disruption in evaluating plaintiff's subjective complaints.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ considered the Polaski factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. Hogan, 239 F.3d at 962.

B. RFC Determination

The ALJ in this case determined that plaintiff retained the residual functional capacity to perform the full range of sedentary work, and that this RFC did not preclude the performance of plaintiff's past relevant work. Plaintiff contends that the ALJ erroneously expressed the RFC determination in terms of the exertional category of sedentary work, instead of making specific findings regarding plaintiff's abilities in terms of exertional requirements. Plaintiff also argues that the ALJ erroneously failed to include sufficient limitations arising from her mental impairment, and failed to properly analyze evidence of her physical

-41-

impairments, ignoring evidence favorable to her claim.

Residual functional capacity is defined as that which a claimant remains able to do despite her limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer, 245 F.3d at 704. The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); Anderson, 51 F.3d at 779; Goff, 421 F.3d at 793. Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). It is the claimant's burden to establish her RFC. See Masterson v. Barnhart, 363 F .3d 731, 737 (8th Cir. 2004).

Plaintiff first contends that the ALJ erroneously expressed the RFC determination "initially in terms of the exertional category of sedentary work, and failed to make specific findings regarding [plaintiff's] limitations with lifting, carrying, pushing, pulling, sitting, standing, walking and the like," failing to address her work-related abilities on a function-by-function basis. (Docket No. 19 at page 14). Review of the ALJ's decision reveals no error.

An ALJ's RFC determination should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including functions such as "sitting, standing, [and] walking." Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003)(citing S.S.R. 96-8p, 1996 WL 374184, at *1). The Depover court noted that Social Security Ruling 96-8p "cautions that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" Id.

Here, the ALJ did not simply describe the RFC in general terms. Instead, after reviewing the medical and other evidence of record, and after conducting a legally sufficient credibility determination, the ALJ concluded that plaintiff retained the residual functional capacity to "occasionally stand and walk for 2 of 8 work hours, sit for 6 of 8 work hours and lift and carry up to 10 pounds," and wrote that the evidence was "very clear that [plaintiff] can engage in a full range of sedentary work." (Tr. 49). These findings contradict plaintiff's argument that the ALJ expressed her RFC in terms of sedentary work, and "failed to make specific findings regarding [plaintiff's] limitations with lifting, carrying, pushing, pulling, sitting, standing, walking and the like." (Docket No. 19 at page 14).

The only restrictions cited by plaintiff that the ALJ did not include in his RFC assessment were pushing, pulling, "and the like." (Id.) This does not demand the conclusion that the ALJ

failed to conduct a function-by-function analysis; instead, it is apparent that the ALJ simply did not find plaintiff limited in those areas. <u>Depover</u>, 349 F.3d 567 (rejecting the argument that the ALJ overlooked functions when the record reflected that the ALJ implicitly found that plaintiff was not limited in those areas). The ALJ was entitled to include in his RFC assessment only those impairments and restrictions he determined to be credible following his legally sufficient determination of plaintiff's credibility. See <u>McGeorge v. Barnart</u>, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record").

Plaintiff next contends that the ALJ failed to properly analyze evidence of her physical impairments and ignored evidence favorable to her claim. In support, plaintiff cites evidence from Dr. Rutz noting worsening problems with back pain, a diagnosis of degenerative disc disease, and injections; and evidence of plaintiff's October 26, 2004 bone density study. This argument is unavailing. While plaintiff claims that the ALJ erroneously characterized her July 21, 2004 examination by Dr. Rutz as unremarkable, the undersigned finds no error in such characterization. As noted in the above summary of the medical information of record, on July 21, 2004, Dr. Rutz noted that plaintiff's gait was smooth, and that she had full lumbar flexion and extension with back pain, but listed to the left side, and was tender to palpation in the mid line of the lumbar spine and left

buttock.  Dr. Rutz noted that plaintiff had full strength in her lower extremities, and her hips and knees had full and painless range of motion and were stable.  Radiological imaging of plaintiff's lumbar spine showed a right-sided lower lumbar mild curvature, decreased disc space height at L4-5, and no signs of displaced vertebrae.  Dr. Rutz also noted that an MRI performed on December 9, 2003 showed moderate degenerative changes of L4-5.  While Dr. Rutz did, as plaintiff contends, recommend injections, it cannot be said that the ALJ erred in describing his findings upon exam as "not all that remarkable." (Tr. 47).  Furthermore, the ALJ specifically noted that the objective medical evidence documented moderate degenerative changes, which was what Dr. Rutz reported observing when reviewing plaintiff's MRI.  Finally, Dr. Rutz's records are not particularly favorable to plaintiff's claim.  In addition to the above findings upon physical examination, the undersigned notes that plaintiff failed to follow Dr. Rutz's advice to stop smoking, and failed to call or return to his office to avail herself of the surgical procedure he recommended.

Plaintiff also complains that the ALJ ignored a bone density study that revealed significantly reduced bone density, citing to page 212 of the Administrative Transcript which, as included in the above summary of the medical information, documents plaintiff's October 26, 2004 bone density study.  This study revealed a T-score below -2.5, which was interpreted to represent "significantly reduced bone density (Osteoporosis) when compared to young normal persons of the same sex." (Tr. 212).  While the ALJ

did not specifically cite that bone density study, he listed early osteoporosis, the finding revealed by the bone density study plaintiff complains was ignored, as one of plaintiff's severe impairments. It cannot be said that the ALJ's failure to specifically cite to the October 26, 2004 bone density study means that he failed to consider it. While an ALJ is required to develop the record fully and fairly, the ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

Plaintiff also argues that the ALJ erroneously failed to include sufficient limitations arising from her mental impairment. Plaintiff's argument is unavailing. In determining that plaintiff did not have a severe mental impairment, the ALJ noted that plaintiff had not been hospitalized for mental health issues, and had not sought ongoing mental health treatment. Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1997) (substantial evidence supported ALJ's conclusion that claimant did not have severe mental impairment, where claimant was not, inter alia, undergoing regular mental-health treatment or regularly taking psychiatric medications); see also Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (a lack of regular and sustained treatment is a basis for discounting complaints and is an indication that the claimant's impairments are nonsevere and not significantly limiting for twelve continuous months). The ALJ in this case ordered a consultative

psychological evaluation which, as discussed in detail above, was performed on October 2, 2007 by Dr. Walker. Dr. Walker diagnosed plaintiff with an anxiety disorder and pain disorder, and assigned a GAF score of 65 which, as the ALJ noted, is consistent with mild symptoms. Furthermore, as noted above, the ALJ conducted a legally sufficient analysis of plaintiff's credibility, and properly limited his RFC determination to only those impairments and limitations he determined were credible based upon his evaluation of the record as a whole. See McGeorge, 321 F.3d at 769. In support of her argument, plaintiff merely cites to pages 423-444, and 447-454 of the Administrative Transcript and states that those records support a finding of severe mental impairments, including depression, anxiety and panic attacks. (Docket No. 19 at page 19). Plaintiff does not specify any particular information from these records that she feels supports her argument, nor does she endeavor to describe the mental health restrictions the ALJ should have imposed. Furthermore, all of the records plaintiff cites in support of this argument post-date the ALJ's decision and, as will be discussed, infra, are not probative of plaintiff's condition during the relevant time period. Plaintiff's argument is meritless.


    C.   New Evidence

        Plaintiff next contends that the Commissioner erred in failing to consider new and material evidence that she presented to the Appeals Council and that supports a RFC of significantly less

-47-

than sedentary work.  Plaintiff cites the Questionnaire from Dr. Co and Nurse Murdick noting a GAF of 48 and numerous restrictions; Dr. Beyranvand's records indicating numerous injections and MRI findings of degenerative disc disease, disc bulges and spinal stenosis; and Dr. Roberts' treatment for panic attacks, back pain, and anxiety.  Plaintiff also argues that this new evidence contradicts the ALJ's reasoning.  In support, plaintiff argues that the ALJ's finding that plaintiff did not have stenosis or herniation is contradicted by Dr. Beyranvand's April 25, 2008 findings, and that Dr. Co's Questionnaire contradicts the ALJ's observation that no physician opined plaintiff could not work. Plaintiff's arguments are unavailing.

The Appeals Council must consider additional evidence when it is new, material, and related to the period on or before the ALJ's decision.  <u>See</u> 20 C.F.R. § 404.970(b); <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069 (8th Cir. 2000).  Evidence is material when it relates to the claimant's condition for the time period for which benefits were denied, and not to "after-acquired conditions or post-decision deterioration of a pre-existing condition." <u>Bergmann</u>, 207 F.3d at 1069-70.  The timing of the examination is not dispositive; rather, medical evidence obtained after an ALJ's decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision.  <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984).

Once the Appeals Council considers new evidence, this court does not evaluate the Appeals Council's decision to deny

review, but rather determines whether the record as a whole, including the new evidence, supports the ALJ's decision. <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007); <u>Cunningham v. Apfel</u>, 222 F.3d 496, 500 (8th Cir. 2000). In order to support a remand, new evidence must be "relevant, and probative of the claimant's condition for the time period for which benefits were denied." <u>Estes</u>, 275 F.3d at 725 (quoting <u>Jones</u>, 122 F.3d at 1154); <u>see</u> <u>also</u> <u>Bergmann</u>, 207 F.3d at 1069–70 (evidence is material when it relates to the claimant's condition for the time period for which benefits were denied, and not to "after-acquired conditions or post-decision deterioration of a preexisting condition.")

In the case at bar, the evidence submitted to and considered by the Appeals Council does not support remand because it is either not probative of plaintiff's condition on or before the time the ALJ issued his decision, and/or it merely fails to support plaintiff's claims. Plaintiff argues that Dr. Beyranvand's April 25, 2008 report indicating that MRI testing revealed stenosis and disc bulging contradicts the ALJ's observation of a lack of evidence of stenosis and herniation. However, plaintiff does not cite, nor does review of the record reveal, that the MRI referred to was performed during the relevant time period. As the ALJ observed, the evidence of record probative to the relevant time period failed to document evidence of stenosis or disc bulges. Evidence is material when it relates to the claimant's condition for the time period for which benefits were denied, and not to "after-acquired conditions or post-decision deterioration of a

preexisting condition." Bergmann, 207 F.3d at 1069–70.

Plaintiff further contends that Dr. Co's Questionnaire contradicts the ALJ's observation that the record did not contain an opinion from a treating physician indicating plaintiff could not work, and supports an RFC of significantly less than sedentary work. However, as noted above, Dr. Co specifically indicated that the earliest date that the description of symptoms and limitations expressed in the Questionnaire could apply to was plaintiff's first visit on April 23, 2008, after the ALJ issued his decision. It therefore cannot be said that the Questionnaire is probative of plaintiff's condition during the relevant time period, or that it contradicts the ALJ's observation of a lack of an opinion from a treating physician that plaintiff could not work.

Plaintiff also notes that Dr. Roberts provided "significant treatment for panic attacks, back pain, and anxiety," and prescribed "numerous medications." (Docket No. 19 at page 18). Dr. Roberts' records indicate that he began treating plaintiff on July 30, 2008, several months after the ALJ's decision. Dr. Roberts's records contain no indication that the conditions and need for treatment recorded therein are probative of plaintiff's condition during the relevant time period. In fact, on September 22, 2008, Dr. Roberts noted that plaintiff had had no prior treatment for anxiety. This observation is consistent with the ALJ's observation regarding plaintiff's failure to seek mental health treatment. In order to support remand, evidence must be probative of plaintiff's condition for the time period for which

benefits were denied.  See Estes, 275 F.3d at 725 (quoting Jones, 122 F.3d at 1154).

The undersigned further notes that Dr. Roberts's records are not particularly helpful to plaintiff.  Dr. Roberts repeatedly noted that plaintiff was in no apparent distress; he repeatedly documented normal physical examinations; he never recommended surgery; he never recommended that plaintiff seek treatment from a mental health professional; and he never opined that plaintiff required hospitalization for a psychiatric condition.  Furthermore, on several occasions, plaintiff visited Dr. Roberts with only urinary complaints and reported no other symptoms.  It therefore cannot be said that any of the new evidence plaintiff cites in her brief supports remand.  See Id.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have until July 29, 2011 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact.  Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of July, 2011.